Case number 166691, Housing Authority of Somerset, Kentucky, and others, and Evanston Insurance Company versus Jason Steele, individually, and as co-administrator of the estate of NAS and others. Arguments not to exceed 15 minutes. I, Mr. Vaughn, for the appellants. Morning. Please the court. Good morning. Morning, counsel. Your Honors, I have a collection of excerpts from the relevant insurance policy that I'd like to furnish to the court. We've already got them. Oh, you haven't? Thank you. Did you give them to the other side? Yes, I did Your Honor, this case has been before this court previously, and the situation here remains the same. There are three reasons that the district court's decisions should be reversed in this case. First, the district court exercised subject matter jurisdiction in a case where proper alignment of the parties destroyed or precluded the existence of diversity jurisdiction. Second, the district court improperly found that only the only reasonable interpretation of the underlying facts in this case amounted to only one occurrence under the relevant insurance policy, Part A of that policy. And then thirdly, the district court erred when it found that there was no coverage under Part B of the policy. As this court noted when this case first came before the court, this is an extremely unusual case where one of the plaintiff's alleged legal adversaries actually furnished an affidavit to the plaintiff through its president. That is the Kentucky Housing Authority's self insurance fund, which provided extremely helpful testimony to the plaintiff on the sole issue that was raised in this declaratory judgment action. Specifically, the affidavit in question came from Kent Latham, the president of KASIF, and he averred therein that he had never had any belief that there was coverage under both that there would be more coverage under the insurance policy in question than Evanston itself argued to the court. This court previously and correctly determined that that was a concern, as we have argued, as to whether there was in fact any adversity between the housing authority and Evanston. On remand, what happened with that? The district court addressed the four concerns that this court raised and from our standpoint downplayed each of those or did not address them with a proper respect for the limited jurisdiction of the federal courts. The most significant of those concerns, again, we think concerns the Latham affidavit. In the district court's opinion, the Latham affidavit was not misconstrued. That is simply the personal opinion of one party or a person, in fact. Of course, the affidavit in question in no way attempts to limit its opinion to being just one person's view of the matter. Rather, he was speaking on behalf of a party. He disclosed himself as the president of this party. We think the district court on remand misconstrued this affidavit and instead of viewing it in a light where doubts are construed against federal jurisdiction, it marginalized that affidavit. What was his . . . this Latham, what was his position? He was president. President of what? Of the Kentucky Housing Authority Self-Insurance Fund, one of the named defendants named by the plaintiff. Does he have full authority to speak for that organization or just one person? Well, he identified himself as the president of the organization. There has been no issue about whether he had limited authority. There's been no claim made that he was circumspect in his authority. It certainly was presented as the position of the housing authority itself. Evanston attempted to utilize this affidavit to show the court, the district court that is, that look, even the defendants don't believe that there's more insurance than we're arguing, that is, that Evanston was arguing existed. It was by no means portrayed by Evanston itself as being simply the lay opinion of an individual. What do you make of the, we'll call it the background principle that normally when it comes to complete diversity and alignment of the parties, you have the and here we have the fund, but that's the intuitive self-interest initial approach to an insurance coverage dispute in a declaratory judgment setting. Do you agree with that, that that's the norm and what makes this different is Latham's affidavit? Is that what's going on or do you not even agree with the norm point? I think as an abstract matter, generally when there is a defendant who's been found liable, they're going to want to avail themselves of maximum insurance. I think it's an abstract matter. We wouldn't quarrel with that principle. The circumstances here though, not just the Latham affidavit, but even before the federal action began, the insured in the situation began to closely align itself with the insurer's position, argued in state court that the insurer's interest in a federal forum ought to be protected, even though... You're talking about the state court action. That's correct. That's quite different. There are different norm applies. Once you figure out liability, then insurance company on one side, insured individuals on the other, but I quite agree at the state court when you're figuring out liability, you have different interests at that point. I thought in a normally insurance company on one side and everybody else on the other because they want as much as they can get out of the insurance company. It doesn't seem to me very helpful what happened in the state court is what I'm saying. I think you were referring to a different issue, not a liability issue, but whether... Go ahead. Maybe I can respond to Judge Sutton's comment. Maybe that'll give you the clarity. In the state court action, we were seeking at the time in question to join Evanston as a party to provide coverage for the underlying liability judgment. To that extent, the state court action at its posture at that time was really indistinguishable from the declaratory judgment action. In other words, we were asking the state court to find Evanston liable to pay that judgment in the way that we were seeking to do. The housing authority defendants still attempted to use Evanston and advance their interest in a federal forum. Again, at that point, even though there should have been a natural divide between the two, their interest appeared to be a lie. In fact, throughout this entire case, Evanston and the housing authority defendants have always been on the other side of the V from us. There has been at no point any indication that the housing authority defendants were on, or should have been, on our side of the V. They were never in support of our positions about collecting or enforcing that judgment. When was the agreement reached? The agreement was reached in, I believe it was May 10th of 2015. May 10th of 2015. That's correct. When was this action started? This action was started in February of 2015. Here's the way I think of the affidavit, so just tell me what I'm missing. Let's forget the fund for a second. We've got insurance company Evanston, and we have county and the individuals. I imagine a world in which normally the county . . . When you say county, you mean the housing authority? Yeah, the government entity, we'll call it, the government entity. The government entity, they know they've got liability, so we're at a situation where you've got $3.7 million liability. The county doesn't want to pay it. They're naturally adverse, because they want the insurance company to pay . . . Every dollar the insurance company pays, they don't have to pay, so that's good. In terms of diversity jurisdiction, they're adverse for diversity purposes, but it doesn't seem to me problematic if, hypothetically, the county looked at the insurance policy and said, to be honest with you, we think it's capped at a million. That's just what we think. We're unhappy with that. We wish it weren't so, but we don't think there's a good argument that it goes beyond a million. What that does is establish a possibility of mootness. It doesn't tell you anything about diversity, in my view. That's the kind of analytical flaw, forgive me, of your side. I think the Latham document doesn't tell us about adversity. It tells us about, gosh, if everybody on that side of the case agrees there's a million dollar limit, we have a moot dispute. There's no longer a live case or controversy, but I don't think the affidavit necessarily goes to who's on the right side for complete diversity purposes. Tell me what I'm missing, because that's how I think about the case. I think what you're missing are two things. First . . . I realize, is Latham with the fund, as opposed to the county? I realize that, but I'm trying to simplify things. Just imagine Latham works for the county. I'm just trying to simplify it, but the point is still the same. You get the point I'm making? I believe so. What's wrong with it? There's two things. First off, if there was no disagreement between the county or the housing authority defendants, in this case, with Evanston's position, and this was the sole issue in the case, then you could say it's moot, but you could also say . . . Imagine though that the individuals, for whatever reason, say, no, we don't agree with that. We agree, in other words. The individuals are like, they don't trust the county's ability to come up with the money. They really want Evanston to pay it all, because they know Evanston's a billion dollar company or whatever, and the money will be paid right away. You don't have an entirely moot dispute at that point, but my view is this is why the Latham affidavit just goes to the possibility of mootness. It doesn't establish whether we have complete diversity. You're saying that they should be realigned in that situation. That's correct, Your Honor. Once it was clear, and we argue it was clear from the outset, and we raised it in our answers at the outset, once we were joined in the case, but the Latham affidavit sealed the deal, or made it crystal clear that there was no adversity between Evanston and the Housing Authority defendants . . . But the honesty of an employer, or president of a company, or a governmental body doesn't tell you what their natural interests are. No, but when they voluntarily . . . That's what this is about, what their natural interests are. Right, and it's our position, when they voluntarily cooperate with what is supposed to be their legal adversary . . . Voluntarily cooperate. They're honest. They can read it. It's not that hard to read. I think in that scenario, when the court is presented with two parties who agree on the sole issue of the case, they should be joined on one side of the V, and those who have the dispute about that issue, that is us, should be on the other side of the V. The problem with that is the Housing Authority defendants were Kentucky residents. We are also Kentucky residents, so there was no diversity of jurisdiction. I think that answers your question. So? Did you have a question, Judge Ocom? I was going to say, who filed this declaratory action, Evanescent? Yes, Your Honor. Okay. And they decided the alignment of the parties, so . . . But it's always in the best interest of the Housing Authority to make the insurance company pay as much as they can, because otherwise it's out of their pocket, right? Well . . . That's natural. I think generally that's the case. In this case, that did not obtain, however. In this case, the insurance company and the insurance were in the same legal bed together at all times. There was never a divide between them, and that's what . . . Let's just say we look at the policy and we say this Latham fellow can't read. He's just totally wrong. The limit is not a million dollars. Is the fund going to be unhappy? I don't think so. They're not going to be unhappy with that outcome. They're not going to be sad and, oh, darn, I thought I read it the right way. No, they're going to be thrilled. Everybody on that side of the V will be happy. They will have champagne. They will say this is awesome. Evanston is taking care of the whole deal. Until they . . . Yes. . . . pay the premium the next time. When the Housing Authority defendants have to pay a premium, that reflects . . . $3.7 million is a lot to be happy not to have to pay. It'll take a long time for the premiums to get you close to $3.7 million, right? In this case, according to the deck sheet . . . Did Latham testify along the lines that you just said he would actually be unhappy with our disagreeing with him about the reading? No, he didn't testify in any way other than the affidavit. Is there something special about this policy with respect to the premiums? Well, I think there is. We've argued that there . . . but it's not directly germane maybe to the adversity issue except insofar as it was a substantial premium to be paid for both coverages, Part A and Part B. There were separate premiums for both coverages. On an annual basis, the Housing Authority defendants were paying in excess of $330,000 a year for this policy. No, I'm asking a different question. Is there something special about the pricing of the not having Evanston have to pay out? Is there something in the formula that ties the formula not to general pricing of insurance but to the payout under the policy? I'm not aware of anything. There was no discovery taken. Okay. I just want to make sure that you're not trying to say that somehow in a much more general way that it's going to be tied to the payout. No. I think just generally as most people I think recognize when they have claims against their policies, they're going to face an increase in their premiums typically. The premiums would go up even with the million, right? To a lesser degree, one would expect. I don't come across too many people . . . maybe I need to live with the elite, but I don't come across too many people when they're facing million, $3.7 million judgments that are like, no, no, no, we'll pay it because I hate those premium increases. That really bums me out. I just never encountered that. I agree, Your Honor. To be candid, I've never encountered a case where the insured colludes with the insurer to say, hey, your actual average obligation is limited. I have encountered cases where people have said, honestly, I've read the policy and I quite understand that after reading the policy. Okay. Well, your experience is obviously richer than mine. I just haven't encountered that. Poor, poor, poor, not richer. I think this is part of the dilemma the federal court is always in when it's wondering what the interests of the parties are. It's typically dependent on what the parties say their interests are. I think, again, that's what underscores the importance of this affidavit. It wasn't just an affidavit that said, now that we've settled with Evanston and they've covered us for the million dollars, now we don't believe that there's more than a million dollars in coverage. The affidavit sort of said, we never believed. I just don't think it asks the right question. The right question is, who do we want to win? That's the right question. An affidavit along those lines, that might have convinced me that we shift the norm and realign. But that's not what the affidavit asks or answers. No, it doesn't. But I would submit that at no point have the Housing Authority and Defendants ever indicated in any fashion that they wanted us to win. They have indicated and lended support to Evanston. So in that sense, they're more closely aligned as a plaintiff than the defendant with whom they're hostile. I'm sorry, Judge White. What is the date of the affidavit? The date of the affidavit is, it was in 2000. And Judge White, now that I mention that, I think I've said 2015 for those prior dates. And I think it was actually 2014. I think the affidavit came along in 2015. And I have it here. So by the time of the affidavit, they had already reached the agreement that Evanston would pay the million and you'd look only to the policy. Yes, Your Honor. And the date of that was? Mr. Baum, we've gone well past your time. Oh, I'm sorry. I know we haven't talked about, well, we've talked about one person's impression of the meaning of the policy. Do you want to give us a two-minute set of thoughts on that? I mean, I hate to have you save it all for rebuttal. That's a little unfair to your friend on the other side. If you could just be really quick about your key point on the underlying policy. The key point under Part A of the coverage, and that's the first page of your handout out there, sits forth the deck sheet. And under Part A, the coverages depend on the number of occurrences. And we have cited the Fryman decision from the Kentucky Supreme Court, as has the district court, in finding the district court found that the term accident, which is synonymous with occurrence here, was unambiguous. But in making that determination, it relied upon a decision, Westfield, which in turn relied upon Fryman, the Kentucky Supreme Court decision. And in that case, the Kentucky Supreme Court said that the word accident is not ambiguous, but it was because it supplied a definition which indicated that the term accident is tantamount to a negative or unfortunate consequence. And so we have here three injured parties. We have more than one negative consequence. The district court in this case cherry picked the holdings of Fryman, found that the term was unambiguous, but did not use the definition that Fryman supplied, which rendered it unambiguous. So we think that was improper interpretation. With respect to the second part, Part B, there are two Section 3Es in this case. The one that's really central to the outcome, we believe, is attached as 1, 2, 3, 4, the fifth page of your handout. It's also in the record at docket number 34, 4, page ID 800. And it provides that if there's an occurrence that's covered under Part A, and there's also a wrongful act that's covered under Part B, then only the coverage part with the higher limits will apply to the claims. Well, if your honors would look at the deck sheet, you can see that there are no higher limits provided in this policy. Both Part A and Part B provide 2 million in the aggregate, 1 million per claim or per order. So that part doesn't apply. Thank you. I think, Mr. Vaughan, that's good. Thank you, your honor. We can do the rest of it on rebuttal. I just wanted to at least have started that conversation. Yes, your honor. Thank you. The appellee could respond. So, Mr. Mando. May it please the Court, Mr. Vaughan, Ms. Evans, Mr. Eubanks, Jeff Mando on behalf of Evanston Insurance Company. I'll clarify some key dates that I think would help set the context for the argument. The declaratory judgment action that Evanston filed against the Griffin defendants, Mr. Vaughan's clients, as well as the Housing Authority of Somerset and the self-insurance fund was filed on February 11, 2014. At that time, the Housing Authority of Somerset was facing down the barrel of a $3.7 million judgment that had been entered in the Pulaski Circuit Court. Mr. Latham's affidavit, which they want to cite as the primary basis to try and defeat adversity at the time that the declaratory judgment was filed, was not signed until November of 2014. So more than 10 months after the suit was filed was when Mr. Latham signed the affidavit. After the DEC action was filed. The DEC action, correct. The state court action, your honor, had been pending for years in Pulaski Circuit Court, but the declaratory judgment action was filed after the judgment had been entered. Out of curiosity, have the individual plaintiffs been paid a million? They were paid the million dollars. At the time of the settlement. At the time of the settlement. And that timing is key too, your honor, because after the DEC, first of all, we've got the judgment entered against the Housing Authority of Somerset for $3.7 million in favor of Mr. Vaughn's claims. Evanston hires us and we file the declaratory judgment action February 11, 2014. At that point, we sue like we normally would in a case like a declaratory judgment. We sue the insurers and we sue the claimants because they have adversity of interest. Latham signs his affidavit later that year. Much later, November 14. What happens in the interim is in April or May of 2014, two to three months after the declaratory judgment action had been filed, there was a mediation in Somerset, Kentucky, that former Chief Justice Joe Lambert mediated, and that's where the agreement was reached. It's referenced in the record. And after that agreement was reached, Evanston paid the million dollars, which was undisputed, that they owed under the terms of the policy. Mr. Latham's affidavit, to put this in context, why would he sign this affidavit November 14? And I think you can draw this from the record. We're briefing summary judgment at that time about what the policy means. They're arguing, Mr. Vaughn's clients, are arguing that there's more than a million dollars in coverage available under the reasonable expectations doctrine under Kentucky law. What's the reasonable expectation of the insured? Our argument in response was, well, we don't think that applies because Mr. Vaughn's clients are not the insureds, but being probably over thorough now that I look at it, I went and said to the Housing Authority's self-insurance fund counsel, can I get an affidavit or talk to your client? He signed an affidavit saying here's the way I read it. Losing by winning. Yes, and I've learned that. But I was trying to defeat the reasonable expectations doctrine at the time. So I think that understands the context of how this thing occurred. But that affidavit does not in any way defeat diversity and the adversity of interest that existed at the time the lawsuit was filed. The cases, the United States. What about this way of thinking about it? I mean, you would think the fund would normally want its insured to collect as much as possible. So that would make them seem to be on the right side of the case. But the fund, as some of these documents show, represents all these other counties or other governmental organizations. Does that change it a little bit? I mean, because it is true. It is. Their premiums will go up a little with a million, more with 3.7. I mean, I still would think they'd have a fiduciary duty to help each individual governmental entity as much as they could. But I guess I kind of see this point that everyone else is now going to be hurt. They do, and it's a self-insured fund, and they were the named insured. Their interests were absolutely aligned, directly aligned with the Housing Authority of Somerset. And so that doesn't change the fact that at the time we filed the suit, the interest of everybody, the Housing Authority of Somerset, the Kentucky Housing Authority Self-Insured Fund, was to avoid an excess judgment, which is what they were facing. So that's why their interests were clearly adverse from Evanston at the time the declaratory judgment action was filed. In their answers to that declaratory judgment complaint, they took the position that, first of all, it calls for conclusion of law. I mean, the standard stuff you see, it calls for conclusion of law, but we otherwise deny the allegation that it's a million dollars in coverage only, as we alleged in that complaint. The settlement was reached in April or May of 2014, months later. They have not cited in their brief one case, one Sixth Circuit case that says that you should look to things that occur after the time of the lawsuit was filed, and that that can be looked at to defeat diversity. We've got a Supreme Court case, the Freeport case. We've got Sixth Circuit cases, a couple we cited, Napoleano and others that said you've got to look at the time the lawsuit was filed, because litigation is moving. Things morph and change during the course of a case. So we've got to look, wisely I think the law is, we've got to look at the time the suit was filed, and that's the key. They cite one case in their reply brief. They cite a district court case, and it was a well-written decision by Judge Seiler, the Cole case. Definitely look to it. Yeah, the Cole case. But that, it's really not on point. It had to do with the case that was removed from state court to federal court where the plaintiff didn't, there was diversity, but the plaintiff in that case did not allege what the amount of controversy was. And so there was a dispute about, well, is it $75,000 or not? And Judge Seiler remanded it because he said removal jurisdictions should be construed narrowly. So I think the case is distinguishable on those grounds, and I don't see, I certainly don't see that case from Judge Seiler in any way defeating, overriding, or questioning the Sixth Circuit jurisprudence or the United States Supreme Court jurisprudence that we've got to look at the time the lawsuit was filed to determine that adversity. So we think that the district court judge, on remand, looked at all of the factors that the Sixth Circuit questioned in Evanston 1, and I think it bears emphasis to recognize that they didn't raise jurisdiction until the appeal in Evanston 1. They never brought a jurisdictional question before the district judge. They have a right to do that, but it helps explain why the record may not have been quite as crystal at that point in time. And then Judge Reeves, on remand, looked at all of the factors from Evanston 1 and addressed them and said, you know, when you look at all these factors, the Latham Affidavit, the fact that they didn't file an appellate brief, fine. They don't address the key components. What were the interests of the parties at the time the lawsuit was filed? And he then drew the conclusion that he had jurisdiction based on those cases. Now, with regard to the... Can I say, before you get to the next point, just a shifting interest point? So I totally understand why Evanston still cares about this, $2.7 million or up to that. As I understand it, Mr. Vaughan represents the individuals, right? Mr. Vaughan, Ms. Evans, and Mr. Eubanks. So why do the individuals care anymore? They have their state court judgment. They've got a million, and they're going to get $2.7 one way or another. Government authorities are usually good for it. So why do they care? I don't understand why they care about this. You mean the individuals? Yeah. They care because they want to win this case because if they get this court to reverse and find that there's more coverage, that money goes to them. No, but, I mean, they have a judgment. They have a $3.7 million judgment. When they settled the case, they released the housing authority, and they released the settlement agreement. Yes. In April or May of 2014, at this mediation, they agreed to take the million dollars that Evanston had tendered. They agreed to release the housing authority of Somerset and Kentucky Housing Authority self-insurance fund at that point and pursue only their claims against Evanston, if that helps clarify the situation. This was after the declaratory action was filed. Several months. Yes, several months. But before the affidavit was filed. Correct. The affidavit followed about five or six months later, November of 2014. Got it. All right. So with regard to the interpretation of the policy itself, I mean what this really boils down to is does Kentucky follow, given the language and the policy, and does Part A apply? And Judge Reeves in the district court concluded it did, the public liability portion for an accident. And is this a single occurrence, or do we have multiple occurrences such that we get to the $2 million aggregate as opposed to the $1 million per occurrence? The Kentucky law that we cited in our brief, I think, is in line with the majority of jurisdictions that have found that they adopted the cause theory. We have to look at the number of events that occurred that led to the injuries. And in this case, it's undisputed, one tree fell one time. What they want to do, what they're arguing, is that Kentucky law should be construed to adopt the effects theory, which has been clearly the minority view across the United States. And under the effects theory, you look at the number of people that have been injured, where they would qualify because they've got an unfortunately dead 17-year-old mother, her fetus who died in this accident several hours later. They've got an injured cousin, Mr. Thacker, who was there. But I think the law wisely says that we don't adopt that effects theory. It's better to look at the cause, the number of. How many jurisdictions follow the effects theory? A very limited number. We put in our brief, Your Honor, we listed the majority of jurisdictions that adopted the cause. I can't give you the exact number, but I know that the cause theory is the majority rule in the United States. And in Kentucky, the cases say that that's what we've adopted, contrary to what Mr. Vaughn was arguing on appeal here, is if you look at the Continental Insurance Company v. Hancock case, which they don't really address, but that case clearly says under Kentucky law that we look at the cause theory. And that was a case where three individuals got involved, three patrons of a bar, got into a fight with three employees of a bar, and an issue became how many occurrences happened as a result of the injuries that were suffered during this bar fight. And the Kentucky court said this is a single occurrence. That bar fight was a single occurrence. We don't look to the number of people that were injured. That same rationale was adopted in the Gateway Insurance Company case that we also cited in our brief, where they recognized that Kentucky has adopted the cause theory. This effects theory is not one that has found any strong support, or that I can find that's ever been adopted in any Kentucky case. And Judge Reeves recognized that in finding that that's what we're dealing with here. We've got the Part A policy, the Part A public liability policy that's been triggered. It's a per occurrence. We've got a single accident. It's the million-dollar single limit that then applies that was paid. And we don't get into the Part B part. Part B is the public official's liability part of the form, and that covers wrongful acts as defined under the policy. So, for example, if the housing authority had been sued for employment discrimination or something along those lines, that would trigger that type of action. Well, let's assume it applies. Then what happens? Please. Assume it applies, that it was a wrongful act. It does apply. Then we look to Paragraph 3E of the policy and what those paragraphs 3E in both Part A and Part B say essentially the same thing. There's some bold-faced language in Part A. The language is the same. And I think it says claim versus claims. There's the only differences in those two paragraphs. But they both say the same thing when you read them. They say that if you've got an incident that is an occurrence under Part A, but it also qualifies as a wrongful act under Part B, then whichever coverage limit is higher is the one that applies, but only one. Then it says, however, if in the situation where you've got an occurrence that's also a wrongful act, and if the limits are the same, if they're equal, then in that particular case, the Part A coverage applies. That's what Paragraphs 3E say in both. And so in this case, that's what we've got. We've got a million-dollar single limit per claim. We've got a million-dollar single limit per occurrence. We've got two million aggregate under both coverage forms. And Judge Reeves correctly determined that in that particular case, given that language, it was clear, it was not ambiguous, that we're looking solely at the coverage Part A in this particular case. And Evanston's liability in this case, it's policy. It's contractual obligations, given the facts of the case, are limited to the million dollars, which Evanston has paid. So for those reasons, we would ask this Court, affirm the District Court's finding that it had diversity of jurisdiction at the time the lawsuit was filed and that it correctly determined and interpreted the insurance policy that's at issue in this case. Unless the Court has any other questions for me at this point, I'll defer to Rebecca. Thank you. Thank you. Mr. Vaughn. Can I suggest that you pick up where you left off? Yes. In fact, that's very helpful. You've heard Mr. Mando paraphrase these sections, but as is the case with any interpretation of a document, you need to look at the actual language. And again, I'm referring to page ID 800, which is, I believe, page 5 of the handout that we have furnished the Court. And what it exactly says is that if there's coverage under A and coverage under B, that is, if you have an occurrence and you have a wrong flag, then, and I'm picking up from the last clause that's highlighted, then only the coverage part with the higher limits will apply to the entire claims. When I left off, I indicated, of course, you can look at the deck sheet and see there is no part that has higher limits. They have equal limits. Now, this is what's so key about the actual language. It says, if the applicable limits of each coverage part are equal, and that's where the word applicable becomes so critical here, because according to our interpretation, the applicable limits under Part A, because there's more than one occurrence here, would be $2 million in the aggregate. However, under Part B, the applicable limits would be $1 million because there's only one claim. Okay, so this rests upon agreement with the idea that there's more than one occurrence. That is correct, Your Honor. If that's wrong, then this Part B thing doesn't really get you anywhere. I think that's correct, Your Honor. And that would dovetail perfectly with what Mr. Mando argued about the occurrences issue. He just represented that we have argued that the effects test should apply. We have not argued that as a principal argument. We've argued that in the alternative. Our principal argument has been that you follow the Kentucky Supreme Court's decision in Fryman, which said an accident is an unintended or negative consequence in the singular. So if the district court— You agree Kentucky follows the occurrence approach, but you just think this particular case helps elaborate how the occurrence approach works and does so in a way that helps you. Is that the way to put it? No. The Kentucky Supreme Court hasn't decided, at least clearly, in any opinion, and there's no Kentucky opinion, that decides whether it's in the effects camp or the cause camp. And that's really the two camps. Occurrence is synonymous with accident here. The question is, what is an accident? Is it decided by the effects or the cause? And no Supreme Court or any other Kentucky state decision has ever ruled either way. But what it has— Out of curiosity, for my purposes, I think of it as the occurrence, but I guess you can call it cause either way. That's clearly the majority test. How many states are there on the other side? I'm not aware. I know that is the minority approach. I would submit to Your Honor that it's really an academic question. The Kentucky Supreme Court has routinely, or at least on several occasions, been willing to adopt its own position irrespective of what the majority approach is, just as any state court has that prerogative to do so. And in this very context, the Kentucky Supreme Court has said the word accident means negative consequence. So you don't have to decide whether it's an effects test or a cause test. All you have to do is say the Kentucky Supreme Court has said— But what do you think of Hancock? And, in fact, we've addressed that specifically, Your Honor, on pages— I'll tell you the bottom line. Hancock didn't explain its rationale at all. He doesn't say it adopts the effects test. He doesn't say it adopts the cause test. He doesn't explain its rationale at all. So there's nothing to be divided from Hancock at all. So Davis, the court of appeals case, when it says Kentucky's adopted the cause approach, citing Hancock, it was just exaggerating or going a little further than the law allowed? You said Davis? Yeah, Davis v. Kentucky Farm Bureau Mutual Insurance Company, I thought at one point, when it says they've adopted the cause approach and cited Hancock for that purpose. Your Honor, I'm aware of the Gateway case that the district court relied upon, and it said that Kentucky—and that's the only case that the district court has relied on, and that's the only case that Evanston has attempted to rely upon. And it did cite Hancock, admittedly, but it was a misapplication. There's nothing in Hancock. I've read the case many times. There's nothing in there that indicates it was an adoption of an effect or a cause test. And again, we pointed out in our briefs from pages 37 through—that's page ID, but actually brief pages 28 through 34 that Gateway, the decision that cited Hancock, involved different language than is at issue here. Cited a road rival— What was the language? It was— This language is what, occurrence? And then what's the— In Gateway, it was accident includes continuous or repeated exposure to the same conditions resulting in bodily injury or property damage. Now, the Gateway court itself, as we indicated in our brief, said that this definition at first glance appears unhelpful, but then nevertheless went on to emphasize that inclusion of the causation words resulting in, in that definition, meant, quote, that the ordinary meaning of the word accident must be modified. So, in other words, the case they're relying upon had a different definition, and it was Gateway's recognition that that different definition meant that the word accident had to be modified from its normal meaning. Its normal meaning is established in private. Out of curiosity, I know Kentucky does things its own way, and I'm not denying that, but if this case were in a jurisdiction that filed the cause test, would you agree this policy would create a problem for your side of the case? Absolutely not, Your Honor. There are two in the district court— So it just doesn't matter at all from your perspective? Well, it's easier to meet the effects test. We have three victims here, three negative consequences. It's easier to prove that. The cause standard, though, we have two different causes here for injuries. We have the infant child that died from cardiac arrest an hour later after his mother. Different cause. His mother died because of blunt force trauma in the tree. Those aren't the insurable causes. I'm sorry, Your Honor, I couldn't hear.  I mean, they're not providing insurance for people losing babies or for people who are injured. The insurable event is the falling tree. Well, I suppose it depends on how you look at it. You know, from our standpoint, and we've cited several cases that we think this is more comparable to, this was a tree that fell, but a tree is not just one item. A tree has many branches. And just like in the Coykus case that we cited from the Florida Supreme Court where two individuals were shot by two bullets from one gun, even under the cause standard there, the Florida Supreme Court said there were multiple causes because, first off, the insurer failed to define the policy with specificity to exclude that, and you have to indulge the presumption of wide and liberal coverage wherever possible, but also because there were two instrumentalities or two parts from the originating item or instrumentality here that caused the injury. Here we had two people injured by two different parts of the tree. The testimony at trial was they were many, many yards apart from each other. Two different limbs hit them. So this is comparable in that sense to one gun shooting two bullets causing two occurrences. We had two branches here that caused two different injuries. Sure, they were from the same tree, just like the bullets were from the same gun. But then why wouldn't the bar fight be multiple causes? And I'm not sure which case Your Honor is referring to about that. I'm not sure what the facts of that case were. One of the cases was about a bar fight. I mean, you guys are the lawyers. Well, you know, I mean, not knowing more about the facts, maybe there was one punch that knocked them both out. I don't know. I mean, that would explain the situation, and it may depend on what jurisdiction that was from. It wasn't a Kentucky case. Because, again, there's been no Kentucky case that has said the causation or effects test applies definitively, other than Fryman when it says the term is defined by negative consequences. Now, that sounds a lot like the effects test to me, when you're focused on consequences rather than cause. But it's our position that even if you do look at just causation, we still have at least I thought Hancock was the case about a bar fight. You seem to say you've read that case many times. Yes. All right. Well, answer Judge White's question. Well, what I recall about Hancock is that the court did not in any way identify that it was applying a cause or effects test. There's no discussion of that at all. It may not use that language, but this was a response to your point that a tree has different branches, and maybe one branch had one effect, the other branch another effect. And what matters most is not necessarily the words of this or that opinion. It's the fact pattern and what the outcome was relative to the insurance policy. So you may be entirely right that Hancock doesn't say, today we adopt the cause test. But the more important question, way more important than that sentence, would be what they were actually doing. Your Honor, the Hancock decision back in 1973 obviously has been trumped now by the decision in Freiman by the Supreme Court. So that's your key position. So if we don't agree with that. I'm sorry. I mean, does Freiman say we hereby overrule Hancock? It does not. It does not say that expressly. It does set forth the rule that I've indicated. And again, in the decision in Hancock, there was not this sort of policy at issue. There wasn't an attempt to define the word accident like there was in Freiman. I mean, Freiman, even though it does have distinguishing features, it is the most authoritative statement on how Kentucky courts define the word accident. And I would just mention about Judge Sutton, you're concerned about the consistency of these cases. There is a treatise or an article that we have cited, and I think even the court noted it in Evanston 1. There are a long line, and specifically I'll mention the article of the law of liability insurance, I think is it. There's an academic article, and I can't recall what it is. But the point of that article, if your honors have an opportunity to read that, is these decisions, a lot of these are very inconsistent decisions. It's very difficult to figure out why one court would say the bar fight would constitute one accident, whereas you have other cases. We're going to do our best not to let that happen here, which seems like an appropriate way to end things. So thank you very much to both of you for your helpful briefs and oral arguments. Thank you, your honor. Thanks for answering our questions. We always appreciate that. The case will be submitted, and the clerk may adjourn court.